Exhibit 7

Exhibit 7

**EXPERT REPORT**

**of**

**GREG REGAN, CPA, CFF, MBA**


*PAUL A. DiMARTINI AND BRITT T. JOHNSON*

*v.*
*PURCELL TIRE & RUBBER COMPANY ET AL*


**UNITED STATES DISTRICT COURT**
**STATE OF NEVADA**

**Case No.: 3:09-cv-00279-HDM (VPC)**


Greg Regan, CPA, CFF, MBA

6/3/10
Date

# Table of Contents

1.  Introduction ................................................................................................................. 2

2.  Nature of My Assignment ............................................................................................ 2

3.  Qualifications ............................................................................................................... 3

4.  Evidence Considered ................................................................................................... 4

5.  Summary of Opinions .................................................................................................. 4

6.  D&D is Entitled to $2.4 Million From Purcell Pursuant to the Earn Out Agreement .............. 4

   a.  The First Amendment to the Stock Purchase Agreement Established the Purchase Price
       for D&D ................................................................................................................... 4

   b.  Grant Thornton Determined D&D's Earn Out To Be $2.3 Million ........................................ 5

   c.  Grant Thornton Did Not Consider All Evidence Related to D&D's Sales to Goldcorp ........ 5

   d.  Other Considerations Related to the Recognition of Revenue on the Goldcorp
       Transactions ............................................................................................................ 8

   e.  GAAP Warrants the Consideration of All Evidence Related to D&D's Accounting For the
       Goldcorp Transactions .............................................................................................. 9

   f.  Grant Thornton's Earn Out Calculations Should Be Adjusted to Reflect A Proper
       Accounting For the Goldcorp Transactions ................................................................ 13

7.  Purcell's Counterclaim Is Flawed .............................................................................. 13

   a.  The Purchase Price For D&D Was Not Computed Using An EBITDA Multiple ................. 13

   b.  Purcell Incorrectly Claims That The Revenue From The Goldcorp Transactions Was
       Extraordinary .......................................................................................................... 14

   c.  D&D Did Not Falsify Purchase Orders Related to the Goldcorp Revenue ....................... 16

   d.  The Due Diligence Performed By Purcell Provided the Opportunity For It To Understand
       D&D's Financial Statements ..................................................................................... 16

   e.  D&D's Financial Performance During the Earn Out Period Exceeded Expectations ......... 18

8.  Prejudgment Interest ................................................................................................ 19

## 1.  Introduction

The opinions expressed in this report and information presented in the accompanying exhibits are my present opinions.  Amendments or supplements to this report and its accompanying exhibits may be required because of developments prior to or at trial, including, but not limited to, the discovery of new evidence, expert discovery, and the testimony of any other witnesses in deposition or at trial.

I anticipate using at trial selected exhibits attached to this report, documents reviewed in connection with their preparation, enhanced graphic versions of selected exhibits included in this report (*e.g.*, redrafted to improve their presentation quality) and additional graphics illustrating concepts described in this report.

## 2.  Nature of My Assignment

I have been retained, through my employer, Hemming Morse, Inc., Certified Public Accountants, Litigation and Forensic Consultants ("HMI") by Manatt, Phelps & Phillips, LLP.  I have been asked to provide expert testimony as to:

- Whether D&D Tire's ("D&D")[1] financial statements were prepared in accordance with generally accepted accounting principles ("GAAP") for the twelve months ended March 31, 2008 and the nine months ended December 31, 2008,[2] with respect to certain transactions with Goldcorp.[3]

- The completion of Grant Thornton's analysis relevant to the Goldcorp transactions, and the impact of that analysis, if any, on the amount owed by Purcell Tire & Rubber Company ("Purcell") to D&D as computed by Grant Thornton pursuant to the Earn Out Agreement dated May 1, 2008 (the "Earn Out Agreement").[4]

---

[1] D&D was owned by Paul DiMartini and Britt Johnson.  For purposes of this report, references to D&D are intended to refer to Mr. DiMartini and Mr. Johnson and vice versa, unless otherwise noted.

[2] GAAP is a technical accounting term for the standards that describe how to measure, recognize, present and disclose transactions and events in financial statements. The primary source of GAAP is the Financial Accounting Standards Board ("FASB").

[3] Minera Peñasquito - a D&D customer referred to herein primarily as Goldcorp.

[4] This report does not attempt to reconsider Grant Thornton's final determination of the earn out amount.  Rather, this report serves to complete Grant Thornton's analysis regarding the Goldcorp transactions.

### 3. Qualifications

I am a Certified Public Accountant ("CPA"), licensed in the State of California. I also hold the Certified in Financial Forensics ("CFF") from the American Institute of Certified Public Accountants ("AICPA") and the Certified Fraud Examiner ("CFE"). I have a Masters in Business Administration with an Emphasis in Finance. My work in the accounting profession includes experience as an auditor, as a controller of a publicly traded company, and as a consultant. My expert qualifications, including my testimony in the last four years and the publications I have authored, are described in Exhibit A hereto.

I have been a CPA continuously since 1998. Since 2003, I have worked on more than 70 complex litigation matters. My work has involved the analysis and interpretation of financial statements and transactions, including contractual disputes, of entities across a diverse range of industries, such as manufacturing, retail, real estate, and high technology companies. I have performed these types of analyses related to large and small companies in the private sector, as well as for public companies and their audit committees. I have also been engaged by the U.S. Securities and Exchange Commission (the "SEC") and the Public Company Accounting Oversight Board ("PCAOB") to perform these types of analyses.

I am a member of the AICPA and the California Society of Certified Public Accountants ("CalCPA"). I have served on CalCPA's statewide Litigation Services Steering Committee since 2007. This Steering Committee provides guidance to the more than 500 members of its four Operating Sections – (1) Economic Damages, (2) Business Valuation, (3) Fraud and (4) Family Law. I am currently the Vice Chair of the Economic Damages Section. I also served on CalCPA's statewide Accounting Principles & Auditing Standards committee from 2005 through 2010.

I am also an Adjunct Professor at Golden Gate University where I teach a graduate level accounting course entitled "Introduction to Financial Forensic Accounting." This course includes instruction related to economic damages, such as those from disputes associated with mergers and acquisitions, as well as investigations of financial statement misrepresentations. The AICPA has selected this course as its national education platform associated with the CFF certification for accounting practitioners.

My firm is being compensated for my review and analysis in this matter at my standard hourly rate, which is currently $380 per hour. Others have assisted me in my work and my firm is being compensated for their work at their standard hourly rates.

### 4. Evidence Considered

In undertaking my assignment, I have considered information from a variety of sources, each of which is of a type that is reasonably relied upon by experts in my field. Those sources are identified in the documents and testimony cited herein and Exhibit B to this report. I have also relied upon my own professional judgment and expertise gathered during the 15 years I have been practicing accounting and analyzing financial statements, audits and reviews of financial statements, and transactions that are the subject of legal disputes.

### 5. Summary of Opinions

- The gross profit reported in D&D's financial statements for the twelve month period ended March 31, 2008 and the nine month period ended December 31, 2008 did not require adjustment related to the Goldcorp transactions to comply with GAAP or to be used for purposes of the earn out computation.

- D&D is entitled to $2.4 million pursuant to the Earn Out Agreement (see calculation presented in Exhibit 1 to this report).

### 6. D&D is Entitled to $2.4 Million From Purcell Pursuant to the Earn Out Agreement

  a. *The First Amendment to the Stock Purchase Agreement Established the Purchase Price for D&D*

D&D and Purcell entered into a Stock Purchase Agreement ("SPA") on April 22, 2008. The SPA stated that the purchase price for D&D was to be calculated as trailing twelve month EBITDA multiplied by 4.25 (§ 2.2).[5] On May 1, 2008, however, D&D and Purcell entered into the First Amendment to the Stock Purchase Agreement, which changed that methodology. Specifically, the purchase price became fixed at $16 million plus a variable component subject to an Earn Out Agreement.[6]

---

[5] EBITDA is an abbreviation for the metric Earnings Before Interest Tax Depreciation and Amortization. It is calculated as Net Income plus interest expense plus depreciation and amortization plus federal and state income tax. Schedule 2.2 of the SPA identified EBITDA in the twelve months ended March 31, 2008 as $4.22 million. As such, the implied purchase price was approximately $17.9 million (i.e., $4.22 million * 4.25).

[6] §1 of the First Amendment to the SPA deleted §2.2 of the SPA and restated it in its entirety as follows: "2.2 Consideration. The purchase price for the Shares (the 'Purchase Price') shall be SIXTEEN MILLION AND NO/100THS DOLLARS ($16,000,000.00), subject to adjustment only as provided in Sections 2.3.1 and 2.3.2 and pursuant to the Earnout Agreement, dated as of the Closing Date..." The agreement also included a working capital adjustment.

The Earn Out Agreement set forth specific financial Performance Goals, which, if achieved, would result in incremental transaction proceeds payable to D&D (Exhibit A to the First Amendment to the Stock Purchase Agreement).[7]  As such, the Earn Out increased the risk to D&D that it would obtain the full extent of the purchase price contemplated under the SPA. This risk, however, carried with it the potential that D&D would be entitled to relatively more consideration should the performance of the business during the Earn Out Period warrant it.

The Earn Out Period included the nine months from April 1, 2008 through December 31, 2008 (Ex. A, § 1(a)).  Purcell was obligated to provide D&D with financial statements covering this period within 45 days of its conclusion (*i.e.*, approximately by February 15, 2009). (*Ibid.*)  The financial statements summarizing the Performance Goals were required to be prepared as follows:

> ...in accordance with United States generally accepted accounting principles, as consistently applied by D&D ('GAAP') and D&D's standard accounting practices...

Purcell, however, failed to provide D&D with financial statements relevant to the computation of the earn out on a timely basis.  At least in part for this reason, in accordance with the provisions of the Earn Out Agreement (Ex. A, § 1 (b)), the parties retained the accounting firm, Grant Thornton, to reach an independent determination of the amount of the earn out due to D&D.

### b.  Grant Thornton Determined D&D's Earn Out To Be $2.3 Million

D&D and Purcell supplied Grant Thornton with accounting documentation relevant to the computation of the earn out in various communications between May 2009 and January 2010. Grant Thornton reviewed the materials on an iterative basis during which time it posed various inquiries and requested additional information from the parties.  Ultimately, Grant Thornton reached a final determination that D&D was owed $2,283,721 from Purcell pursuant to the Earn Out Agreement (see Appendix A to February 1, 2010 letter).

### c.  Grant Thornton Did Not Consider All Evidence Related to D&D's Sales to Goldcorp

With respect to one of the types of disputed items; two (2) purchase orders between D&D and Goldcorp (*i.e.*, sales transactions), however, Grant Thornton relied exclusively on the original transaction documents in reaching its determination rather than the corrected versions of the

---

[7] Unless otherwise noted, references to "Ex. A" in this section are intended to refer to the First Amendment to the SPA.

relevant documents.[8]  The corrected documents include a cover letter from Goldcorp that stated:[9]

> Thank you for bringing into our attention that the stated INCO on two of our 53/80-63 PO's (sic) *where* (sic) *incorrectly stated*. I have had Alma Puente, Purchasing, [Goldcorp], *correct the two PO's* (sic) in question *to match what was originally agreed to* an (sic) as stated on the very first 53/80-63 PO...I apologize for any inconvenience this may had (sic) caused you and D&D Tire, Inc.[10]

These corrected documents were dated by Goldcorp in April 2009 and supplied to Grant Thornton in July 2009. (*Ibid.*)  Grant Thornton does not appear to have indicated why it did not "independently verify," or why it did not otherwise use, the corrected documents.

These corrected documents are relevant to the computation of the earn out amount due to D&D because the documents dictate the period in which title transferred to Goldcorp.  In turn, the title transfer indicates the period in which GAAP required the related revenue to have been recognized.[11]  Specifically, the timing of revenue recognition hinged upon whether title transferred upon arrival at Goldcorp's facility in Laredo, Texas (as suggested by the two original purchase orders) or whether the title transferred when the tires were delivered to the carrier in China (as indicated on the two corrected purchase orders).  D&D's original financial statements

---

[8] February 1, 2010 Grant Thornton letter at p.5 citing DJ00589-596, "[D&D has] submitted more recent documents which appear to amend the original terms of the shipment.  Grant Thornton does not have the ability to independently verify amended documents put forth by Seller and, instead, must rely on the original underlying documents which imply risk of loss and title did not transfer until the shipment was received by Goldcorp."

Based upon my discussions with Mr. DiMartini and Mr. Johnson, there is no evidence that Grant Thornton attempted to verify whether these documents reflected the understanding of the parties.

[9] See July 2, 2009 letter from Robison, Belaustegui, Sharp & Low to Grant Thornton, p.3 and related exhibits.

[10] "INCO" refers to standard International Chamber of Commerce ("ICC") terms that are used in international contracts for the sale of goods. In particular, Incoterms, as used by Goldcorp in the cover letter, refers to transfer of title considerations (e.g., costs, risks and responsibilities).

For purposes of clarity, the tires ordered by Goldcorp were described as "New OTR Tires 53/80-63."

[11] The FASB's conceptual framework contains the basic guidelines for revenue recognition in accordance with GAAP. FAS Concepts No. 5 ("SFAC No. 5"), *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶ 83 states "Revenues are not recognized until earned. An entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues."  Ibid. at ¶ 84, "The two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered..."

were prepared consistent with the transfer of title in China (*i.e.*, in accordance with the corrected purchase orders).

The following table summarizes these scenarios. In addition, the table summarizes the initial purchase order from Goldcorp, which notably, a) provided for title to transfer in China and b) did not require corrective action.[12]

| Purchase Order Date[13] | Purchase Order No. | Title Transfer – Original | Title Transfer – As Corrected |
|---|---|---|---|
| July 25, 2007 | PEN069A | China [14] | n/a |
| February 4, 2008 | 4500005367 | Laredo, TX [15] | China [16] |
| April 9, 2008 | 4500013500 | Laredo, TX [17] | China [18] |

---

[12] In my experience, to the extent parties to an arrangement anticipate follow-on transactions, they often negotiate standard terms such as those related to delivery in an initial transaction. Those terms are then replicated in subsequent transactions. Accordingly, it is reasonable to believe that the July 2007 purchase order set forth the expectation of the parties in this instance. Mr. DiMartini and Mr. Johnson have represented that this understanding was reached with Goldcorp at the time of the initial negotiations.

[13] For purposes of this table, the purchase order date for the two 2008 orders was taken from Purcell's submission to Grant Thornton dated September 8, 2009 at p. 2. There is some evidence; however, that at least the latter purchase order was dated September 4, 2008 (*e.g.*, the revised purchase order refers to a quotation dated August 21, 2008). In any event, I do not believe that the precise date of the purchase order is material to this dispute.

[14] DJ00594. The purchase order uses the specific term "CIF – Long Beach, California." CIF is an abbreviation for Cost, Insurance, and Freight, and is consistent with transfer of title at the time the product is delivered to the carrier (*i.e.*, in this case; China). For example, the ICC states regarding the CIF Incoterm, "'Cost, Insurance and Freight' means that the seller delivers when the goods pass the ship's rail in the port of shipment." Source is http://www.iccwbo.org/incoterms/preambles/pdf/CIF.pdf

In any event, Purcell was informed by its external legal counsel with respect to this specific order, "It is clear that under such an arrangement, and even though the term 'CIF' identifies a particular destination, in this case, Long Beach, California, risk of loss and title passes to the buyer when the seller delivers the goods to the carrier." See DJ00607-609 at 608.

[15] DJ00591. This purchase order uses the specific term "FOB – Laredo, TX." FOB is an abbreviation for Free On Board. It is often expressed as "Shipping Point" or "Destination." In this case, the original purchase order indicates title would have transferred in Laredo, Texas.

[16] DJ00590. This purchase orders uses the specific term "CIF – Los Angeles, CA." For the reasons identified with respect to the first order with Goldcorp, title transferred in China.

[17] DJ00593. This purchase order uses the specific term "DAF – Laredo, TX." The term DAF is understood to mean Delivered at Frontier, which, as originally used, appears consistent with title transfer in Laredo, Texas.

[18] DJ00592. This purchase order uses the specific term "CIF – Laredo, TX." See explanation above for conclusion.

### d. Other Considerations Related to the Recognition of Revenue on the Goldcorp Transactions

In addition to the delivery terms on the corrected purchase orders, there is other evidence that supports a conclusion that Goldcorp was willing to accept title to the tires prior to their arrival in Texas. Specifically, each of the original purchase orders included, a) a "Delivery date" that was prior to the dates on which D&D recognized revenue (*e.g.*, see Exhibit 2),[19] and b) a 30% down payment. The down payments were to be made at the time the purchase orders were issued, which, in most cases, was in advance of the invoice date that was concurrent with shipment. In my opinion, the fact that Goldcorp was willing to pay 30% of the arrangement consideration at the time it placed the order is an indication that it accepted certain risks of ownership of the tires prior to the time the tires were delivered to Laredo, Texas.

Alternatively, Purcell's communications to Grant Thornton argue that the substance of the arrangement is evidenced by D&D's re-issuance of certain invoices to Goldcorp.[20] D&D, however, has explained that the invoices were re-issued in the normal course to accommodate Goldcorp's request that the serial numbers of the tires be set forth on the invoice.[21] The nature of this request as well as the re-issuance of invoices in general is not abnormal. Indeed, Purcell has provided a similar explanation in support of a separate adjustment it sought that ultimately reduced the earn out due to D&D.[22] In addition, I understand from my discussions with D&D that upon resubmission the invoices were not "re-dated." In other words, the original invoice

---

[19] In my experience, accountants often consider the delivery date specified on the customer document as evidence of the substance of the arrangement between the parties (*i.e.*, at what point in time did the parties agree that title would transfer). If, for example, Goldcorp had specified a delivery date 90 days in the future, which is not the case here; that fact pattern might be more consistent with Purcell's position.

[20] For example, Holland & Hart's September 8, 2009 letter, p.2.

Purcell also asserted to Grant Thornton that it contacted Goldcorp to understand the nature of the payment terms between D&D and Goldcorp (*Ibid.*). At that time, it apparently learned that payment would not be remitted prior to the arrival of the tires in Laredo, Texas. Purcell, however, has not disclosed, among other considerations, 1) when this conversation was held, 2) who the conversation was held between, 3) what information was provided by Goldcorp in support of its position, or 4) whether it undertook any effort to remediate Goldcorp's position. For example, based upon my discussions with D&D, I understand that the Goldcorp operation in Laredo, Texas is a third-party freight-forwarder, Gamas, which may not have had knowledge about the arrangement between the parties.

[21] For example, Robison, Belaustegui, Sharp & Low letter dated September 15, 2009, p.5-6.

[22] Holland & Hart, January 8, 2010 submission to GT, p.3, "...several invoices had to be re-billed to correct the serial numbers listed on the invoices and Purcell received additional down payments for 2 more purchase orders."

payment terms continued to be enforced.  Purcell's September 8, 2009 submission to Grant Thornton also confirmed this understanding (see p.2).  In my experience pursuant to financial statement investigations, the fact that the invoices were not "re-dated" is a meaningful indicator that the terms of the original invoices were reliable.  Accordingly, at this time, I am not aware of evidence that indicates the resubmission of the invoices constitutes anything other than routine transaction processing between D&D and Goldcorp.

Finally, I note that Purcell acknowledges that it became aware of the transactions with Goldcorp during the acquisition due diligence process.[23]  It is reasonable to expect that Purcell would have addressed the accounting for this arrangement at that time; however, discovery in this matter is ongoing with respect to this issue.

> e.  *GAAP Warrants the Consideration of All Evidence Related to D&D's Accounting For the Goldcorp Transactions*

The responsibility to issue D&D's financial statements rested with its management.[24]  I understand that D&D management believed, and continues to believe, that the Goldcorp transactions transferred title in China (*i.e.*, revenue recognized upon shipment as opposed to delivery).  Reliable evidence supports D&D's position.[25]  Accordingly, D&D implemented its understanding of the arrangement into a GAAP complaint revenue recognition position with commensurate accounts receivable assets.[26]

---

[23] Purcell's Answer to Plaintiffs' First, Second, Sixth and Seventh Claims for Relief and Counterclaims (the "Counterclaim") ¶ 23, "Through the due diligence process, PTRC began to note that D&D had begun generating significant sales (and thus accounts receivable) with one key customer that appeared to be completely new to D&D.  PTRC subsequently identified this key customer as Goldcorp Inc."

[24] For example, GAAS states "Thus, *the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility*. The independent auditor may make suggestions about the form or content of the financial statements or draft them, in whole or in part, based on information from management during the performance of the audit. However, the auditor's responsibility for the financial statements he or she has audited is confined to the expression of his or her opinion on them." AU 110, Responsibilities and Functions of the Independent Auditor, ¶ 03.  (emphasis added)

[25] For example, GAAS in the form of AU 326, Audit Evidence, ¶ 08, states "Audit evidence is more reliable when it is obtained from knowledgeable independent sources outside the entity...Audit evidence is more reliable when it exists in documentary form..."  The corrected purchase orders are consistent with these tests.

[26] In other words, the basis for D&D's presentation of the Goldcorp transactions was consistent with GAAP.  For example, GAAP state "To be reliable, information must have **representational faithfulness** and it must be verifiable and neutral."  See Statement of Financial Accounting Concepts No.2, *Qualitative Characteristics of Accounting Information*, ("SFAC No. 2"), ¶ 33. (emphasis in original)

There are circumstances wherein different entities may reach different accounting conclusions related to the same transaction.[27]  In this instance, Purcell may take the position that the corrected transaction documents should not be considered.  Purcell's position, however, does not appear to be relevant here because the terms of the Earn Out Agreement require the computation to follow GAAP as consistently applied by D&D.  In my opinion, D&D's assertion that the related revenue was properly recognized at the time of the transfer of title to Goldcorp in China meets both of these criterions (i.e., meets GAAP and was consistently applied).  This opinion is consistent with my related experience that when clerical errors arise, and in practice such errors do, it is reasonable to obtain and employ corrected documents that accurately reflect the understanding of the parties.  My experience in this regard is consistent including in my work with financial statement preparers, independent auditors, and the Securities and Exchange Commission.

In addition, GAAP requires the accounting treatment of a transaction or event to follow its substance rather than its form. Because this guideline applies to every transaction or event to be accounted for, it is stated broadly in accounting literature rather than in each individual authoritative accounting pronouncement applicable to particular types of transactions or events. For example, GAAP states:[28]

> The quality of reliability and, in particular, representational faithfulness leaves no room for accounting representations that subordinate substance to form.

GAAS is consistent on this point.[29]  In my opinion, Grant Thornton's conclusions related to the Goldcorp transactions do not appear to have adequately considered the corrected transaction

---

[27] The materials used for the course at Golden Gate University include the Litigation Services Handbook, 4th Edition. Chapter 25, *Common Disputes in Merger & Acquisition Transactions*, p.7-8, states "Preferable versus acceptable GAAP. As Section 25.2(a) discussed, most agreements contain a clause requiring that the closing balance sheet conform to GAAP consistently over a relevant period or point in time that predates the sale. *Parties involved in transactions often mistakenly believe that GAAP clearly defines one correct number and that little or no disagreement can arise.*" (emphasis added) *Ibid.* at p. 12-13, "Parties often agree on detailed stipulations for the accounting principles used to calculate [earn-out] performance. Because *GAAP embraces a wide range of acceptable accounting practices*, sellers often have concerns about the ability [of the buyer] to manipulate the results of an earnout calculation." (emphasis added)

See also, SEC Staff Accounting Bulletin No. 99, *Materiality*, "Where reasonable minds may differ about the appropriate accounting treatment of a financial statement item, a failure to correct it may not render the registrant's financial statements inaccurate 'in reasonable detail.'"

[28] SFAC No. 2, ¶ 160.

[29] Generally accepted auditing standards ("GAAS").  The primary source of GAAS is the AICPA Codification of Statements on Auditing Standards, which has sections with the prefix AU.  Because the independent auditor's role

documents because they are dependent on the form of the original invoices only.  Moreover, Grant Thornton was required by the Earn Out Agreement to defer to D&D's accounting methodologies.[30]  Accordingly, if the terms of the corrected purchase order reflect the substance of the arrangement between the parties (i.e., D&D and Goldcorp) the related adjustments made by Grant Thornton to D&D's financial statements are in error.[31]  GAAP requires material errors to be corrected.[32]

The following table summarizes the accounting periods impacted by the correction to gross profit described above (i.e., the period in which the gross profit should be recorded):

| Goldcorp Transaction [33] | Gross Profit | Grant Thornton | As Corrected (and Originally Reported by D&D) |
|---|---|---|---|
| R1 | $833,052 | Earn Out Period (9 Months Ended December 31, 2008) | Earn Out Period [34] |

includes expressing a professional opinion on whether financial statements are presented fairly in conformity with GAAP, there are AU sections relevant to the application of GAAP.  For example, AU 411, The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles, ¶ 06, "*Generally accepted accounting principles recognize the importance of reporting transactions and events in accordance with their substance.* The auditor should consider whether the substance of transactions or events differs materially from their form." (emphasis added)  See also, AU 334, *Related Parties*, ¶ 02, "In addition, the auditor should be aware that the substance of a particular transaction could be significantly different from its form and that *financial statements should recognize the substance of particular transactions rather than merely their legal form.*" (emphasis added)

[30] While Grant Thornton did not audit D&D's financial statements, it did make adjustments to those financial statements.  In this regard, it is relevant to note AU 110.03, as cited herein, states that the auditor may suggest modifications to the financial statements, but the financial statements are management's responsibility because management has a more complete knowledge of the matters that should be reflected in those financial statements.

[31] Financial Accounting Standard No. 154, *Accounting Changes and Error Corrections*, ("FAS 154"), ¶ 2(h), "Error in previously issued financial statements—an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of GAAP, or *oversight or misuse of facts that existed at the time the financial statements were prepared.*" (emphasis added)  In this case, the original financial statements were not in error as it related to the Goldcorp transactions, and did not necessitate the particular adjustment made by Grant Thornton.

[32] FAS 154 ¶ 2(h), "Restatement—the process of revising previously issued financial statements to reflect the correction of an error in those financial statements."

[33] Refers to the description of the transaction used by Grant Thornton in its February 1, 2010 final determination.

| Goldcorp Transaction [33] | Gross Profit | Grant Thornton | As Corrected (and Originally Reported by D&D) |
|---|---|---|---|
| R2 | $1,346,995 | After the Earn Out Period | Earn Out Period |

For purposes of clarity, with respect to the transaction labeled "R1," Purcell's submission to Grant Thornton September 8, 2009 appears to reflect an error in the understanding of the Earn Out Period.  Specifically, Purcell stated: (see p. 3 of related submission)

> The combined impact of these corrections [to the Goldcorp transactions] was a net reduction to gross profits for the period of May 1, 2008 to December 31, 2008...

This statement appears to misunderstand the Earn Out Period, which according to the Earn Out Agreement runs from *April 1, 2008 through December 31, 2008*.  According to the related schedule submitted by Purcell in support of its position,[35] approximately $682,000 of the gross profit from the R1 transaction was recognized by D&D in April 2008, but should have been recognized between May and July 2008.  In other words, irrespective of whether the title to the tires transferred in China or later in Texas, more than 80% of the related gross profit still should have been recognized during the Earn Out Period.  The correction of this error results in a reduction of the earn out amount due to D&D as computed by Grant Thornton.[36]

---

[34] As described immediately below this table, a minority of the gross profit from this transaction appears to have been recorded by D&D in March 2008.

[35] See Exhibit 2 herein which summarizes the submitted Purcell schedule entitled "Revenue Cut-Off for April 2008" (PTRC0183).  This analysis assumes the accuracy of this schedule as I have not obtained access to D&D's sales journal detail or other accounting data to verify the accuracy of Purcell's schedule.

[36] Based upon Purcell's schedule, these amounts had already been reported as D&D revenue in April.  Accordingly, when Grant Thornton recorded an adjustment to add these amounts to the Earn Out revenue; an overstatement of revenue resulted, which benefitted the computation of D&D's earn out.

  ***f. Grant Thornton's Earn Out Calculations Should Be Adjusted to Reflect A Proper Accounting For the Goldcorp Transactions***

Grant Thornton's final determination identified $22.5 million of gross profit relevant to the computation of D&D's earn out.  The adjustments described in this report require an increase of $0.5 million to D&D's gross profit in the earn out period, which results in total eligible gross profit of $23.0 million.  Based upon the calculation set forth in the Earn Out Agreement,[37] D&D is therefore due $2,412,207 (see Exhibit 1).[38]

### 7. Purcell's Counterclaim Is Flawed

  ***a. The Purchase Price For D&D Was Not Computed Using An EBITDA Multiple***

As discussed above, the First Amendment to the SPA established the operative terms for the purchase price due to D&D.  The First Amendment to the SPA established a fixed price for D&D plus an incremental earn out as opposed to a price premised upon a multiple of EBITDA.  Accordingly, the purchase price for D&D cannot be simply recomputed based upon the timing of the revenue recognition for the two Goldcorp transactions, or for that matter, other disputes.

If Purcell's claim is that the purchase price of D&D should be adjusted on a gross basis due to a difference of the timing of the Goldcorp revenue recognition (*e.g.*, the transaction-specific EBITDA multiplied by 4.25x), such an assertion is likely to ignore other elements germane to the parties' purchase price negotiations.  Stated differently, any purchase price adjustment is likely to also require consideration of the other factors pertinent to the negotiating process beyond simply the Goldcorp dispute.[39]

---

[37] DJ00001.  Earn Out Agreement. Exhibit A. Performance Goal.

[38] Grant Thornton's final determination computed the earn out to be $2,283,721 million.  Therefore, the incremental earn out is $128,486.

[39] For example, Litigation Services Handbook, Chapter 25, *Common Disputes in Merger & Acquisition Transactions*, p.7, "Buyers, however, often find it difficult to prove that they relied on the financial statements in reaching a definitive price.  Buyers often use multiples of metrics to provide broad pricing guidelines, but other significant factors – including negotiating leverage, the presence of competing bidders, tax issues, and synergies – influence the final price."

For purposes of clarity, however, if Purcell's position regarding the timing of the transfer of title is adopted, which it should not be, the total impact to EBITDA for the twelve months ended March 31, 2008 is approximately $76,000.[40]

> b.  *Purcell Incorrectly Claims That The Revenue From The Goldcorp Transactions Was Extraordinary*

Notwithstanding the considerations above, under the terms of the SPA, D&D's EBITDA was required to be calculated in accordance with GAAP using D&D's methodologies consistently applied prior to the close of the transaction.  GAAP, however, does not specify the methods to account for EBITDA, but rather provides the principles for the related financial statement components (*e.g.*, revenue, cost of goods sold, etc.).  The SPA further indicated:[41]

> Non-recurring or extraordinary revenue, expenses, gains or losses...shall not be taken into account in the determination of EBITDA.

Purcell appears to claim that the revenue recognized by D&D from the Goldcorp transactions was non-recurring in nature, and accordingly, should have been excluded from the determination of EBITDA.[42]  Specifically, Purcell claims that the revenue from the Goldcorp agreement was:

> 'Non-recurring' because the Goldcorp agreement was for a fixed amount and should have been excluded in calculating EBITDA.

It is unclear why Purcell has characterized the Goldcorp agreement as for a "fixed amount," or if that were the case, how that resulted in it becoming non-recurring.  As described above, there were three (3) discrete purchases made by Goldcorp from 2007 to 2008.  I understand from my discussions with D&D that at the time of each new order, it continued to pursue additional selling opportunities with Goldcorp, but at no time was there a form of fixed arrangement that encompassed all three transactions or limited lifetime business to these transactions.  Moreover, D&D and later, Purcell via the

---

[40] This amount is less than the residual gross profit on the transaction because the Grimaldi commissions should also be offset in arriving at EBITDA.  In addition, to the extent that this amount is moved into the Earn out Period, the earn out calculation would require an offsetting adjustment.

[41] The SPA indicated that any such non-recurring items would be mutually agreed upon by the parties, but would include the items presented on Schedule 2.2 to the SPA, however, the schedule did not reflect any "Adjustment(s)" to revenue.

[42] Counterclaim, Document 11, ¶¶ 67-70.

former D&D, continued to make additional sales to Goldcorp – even in 2010. Accordingly, in the absence of any further evidence, Purcell's characterization of the Goldcorp transactions as fixed or non-recurring is inaccurate.

In any event, the term "extraordinary" is defined in GAAP as an event that is both unusual and infrequent.[43]  GAAS indicate that non-recurring items and extraordinary items are analogous.[44]  Purcell's assertion that the revenue from the transactions with Goldcorp was "non-recurring" for purposes of determining EBITDA is inconsistent with GAAP.  The following table supports my conclusion that neither of the two criteria that must have been met for the Goldcorp revenue to be considered extraordinary or non-recurring is evident:

| GAAP | Goldcorp Analysis[45] |
|---|---|
| "The underlying...transaction should possess a high degree of abnormality and be of a type clearly unrelated to, or only incidentally related to, the ordinary and typical activities of the entity." | 1. D&D's business emphasized the mining industry.[46]<br>2. D&D had other customers in Latin America.[47] |

---

[43] "Extraordinary items are events and transactions that are distinguished by their unusual nature and by the infrequency of their occurrence. Thus, both of the following criteria should be met to classify an event or transaction as an extraordinary item: [APB 30, paragraph 20] ]  a.  Unusual nature. The underlying event or transaction should possess a high degree of abnormality and be of a type clearly unrelated to, or only incidentally related to, the ordinary and typical activities of the entity, taking into account the environment in which the entity operates (see paragraph 225-20-60-3). [APB 30, paragraph 20] ]  b.  Infrequency of occurrence. The underlying event or transaction should be of a type that would not reasonably be expected to recur in the foreseeable future, taking into account the environment in which the entity operates (see paragraph 225-20-60-3).

[44] For example, AU 312, *Audit Risk and Materiality in Conducting an Audit*, ¶ 60(h), "The significance of the financial statement element affected by the misstatement, for example, a misstatement affecting recurring earnings as contrasted to one involving a nonrecurring charge or credit, such as an extraordinary item."

[45] This table does not attempt to be an exhaustive list.  Rather the table sets forth sufficient evidence that the test set forth in GAAP was not met.
[46] I understand that a significant percentage of D&D's business is transacted with customers in the mining industry. Certain documents within the due diligence production indicate that the mining industry constituted as much as half of D&D's business.

[47] I understand that D&D also had customers in Guatemala, for example.

| GAAP | Goldcorp Analysis[45] |
|------|----------------------|
| "The underlying...transaction should be of a type that would not reasonably be expected to recur in the foreseeable future..." | 1. Goldcorp made several discrete purchases.<br>2. The purchases have occurred from 2007 through 2010.<br>3. Even in 2010, Mr. Johnson and Mr. DiMartini believe that future opportunities exist to make additional sales to Goldcorp. |

      *c.  D&D Did Not Falsify Purchase Orders Related to the Goldcorp Revenue*

The Counterclaim alleges that D&D "falsified the date on the **purchase orders** all in an attempt to inflate the price of the D&D stock and misrepresent the value of the company."[48] (emphasis added)  In this sense, Purcell is misguided because the purchase orders are Goldcorp initiated documents over which I have not seen evidence that D&D exercised control.  The dispute with the Goldcorp purchase orders relates to the timing of revenue recognition rather than the dating of the purchase orders (as apparently raised by Purcell) or, for that matter, the cash value of the transactions.

      *d.  The Due Diligence Performed By Purcell Provided the Opportunity For It To Understand D&D's Financial Statements*

Purcell performed due diligence with respect to D&D, pursuant to which it now claims:[49]

> Upon reviewing the D&D financial records...[Purcell] began to note a significant downward trend in D&D's financial performance...

The table below summarizes D&D's estimated annual revenue and gross from 2003 through 2008 (see Exhibit 3):[50]

---

[48] Counterclaim ¶ 73.

[49] Counterclaim, ¶ 22.  As permitted by the SPA, § 6.4.7, "[Purcell] shall have completed an operational, business, financial and legal due diligence review of D&D, and such review must be satisfactory (in scope and result) to Buyer in its sole and absolute discretion."

[50] These amounts are estimated because the amounts from 2003 through 2005 reflect the twelve months ended January 31st.  Since, for example, eleven of the twelve months ended January 31, 2005 transpired during calendar 2004, I have characterized the twelve months ended January 31, 2005 as approximately 2004 for that and other similar periods.  Beginning in 2006, D&D's reviewed financial statements reflect the twelve months ended December 31st.  The table also includes 2008 because the due diligence continued into that period.  However, the full annual period would not have been complete at the time the due diligence was concluded.  In any event, the monthly periods of 2008 exhibited similar growth trends evident for the annual period.  Additionally, figures for



D&D's growth was also exhibited in its year-over-year revenue growth trend. The chart below illustrates the growth in monthly revenue in 2008 as compared to 2007. This growth was evident in each month of 2008 (see Exhibit 4):



Total D&D revenue for the twelve months ended December 31, 2007 and 2008 was approximately $59 million and $92 million, respectively. Therefore, even if the entire value of the Goldcorp purchase orders were excluded, D&D's 2008 revenue growth still would have

---

the 2008 annual period were obtained from the Grant Thornton final determination. I have used that data for conservatism despite the apparent corrections required to those figures (*i.e.*, the revenue and gross profit figures should be greater).

grown approximately 12% over 2007.[51]  In any event, this analysis likely results in an overly conservative calculation because it does not remove the 2007 Goldcorp transactions or make other potentially necessary normalizing adjustments.

As a result, the data presented in these tables does not appear inconsistent with a significant downward trend apparently noted by Purcell.  It is possible that Purcell identified downward trends in certain of D&D's stores.  While that trend may be observable, it appears to be explained by a change made by D&D to the classification method it used for mining revenues.  Specifically, as D&D reported to Purcell during due diligence, D&D reclassified revenue previously reported by its stores to its corporate sales location.[52]

> e.  *D&D's Financial Performance During the Earn Out Period Exceeded Expectations*

Additionally, during the due diligence, D&D provided Purcell with its budget for, among other considerations, 2008 revenue and gross profit.  The following table compares D&D's forecast with its actual results achieved.

---

[51] At this time, I do not have a sales journal or other comparable information to identify the precise amount of Goldcorp revenue reflected in the 2008 sales figures included above.  However, the total value of the two purchase orders was $26 million ($12.8 million plus $13.2 million).  Therefore, if this amount was excluded from the total revenue of $91.6 million, the total other revenue would be $65.6 million, which would constitute 12% growth (i.e., $65.6 - 58.7 = 6.9 \div 58.7 = 11.7\%$).

[52] See the file in the location, "project drive - BKD\Item Ie - Accounting Method Changes," which states "During phases though 2007, we reclassified most of the earthmover business away from our stores and into a consolidated corporate sales location.  The boom in the mining industry over the last couple of years overwhelmed the stores and distracted the store management from local traditional business performance and distorted the overall results."



This chart demonstrates that D&D outperformed the financial expectations set forth in the budget supplied to Purcell for purposes of the due diligence. To the extent that Purcell's expectations for D&D's financial performance were informed by this budget, its claim that D&D was in a downward trend is not supported by the evidence currently available.

### 8. Prejudgment Interest

In the event that the Trier of Fact awards pre-judgment interest in this matter, I have computed interest on the unpaid proceeds of the Earn Out due to D&D at a rate of 9.25%.[53] I have accumulated interest from the latest date that the payment of the earn out amount was due to D&D, March 15, 2009 (see the Earn Out Agreement at § 2 (a)), through October 30, 2010, which I have used as a current estimate of the date of judgment in this matter. This calculation was prepared on a simple basis (see Exhibit 1). This amount is $363,120.

---

[53] I understand that the applicable rate of interest is the prime rate at the time the agreement was executed plus 2.0% (Nev. Rev. Stat. 99.040). As of May 1, 2008, the applicable prime rate was 7.25%. This rate was obtained from www.fid.state.nv.us/Prime/PrimeInterestRate.pdf.

# HEMMING MORSE, INC.

**CERTIFIED PUBLIC ACCOUNTANTS**
LITIGATION & FORENSIC CONSULTANTS

www.hemming.com

# Greg Regan, MBA, CPA, CFF

## Employment & Education

| | |
|---|---|
| 2003 – Present | **Hemming Morse, Inc.** |
| | ***Certified Public Accountants*** |
| | ***Litigation and Forensic Consultants*** |
| | Director, Litigation and Forensic Consulting Services Group, 2007-present |
| | Manager, Litigation Services Group, October 2003-2006 |
| 2009 – Present | **Golden Gate University** |
| | Adjunct Professor, Introduction to Financial Forensic Accounting |
| 1999 – 2003 | **SupportSoft, Inc. (Nasdaq: SPRT)** |
| | Controller, February 2001- October 2003 |
| | Accounting Manager, April 1999- February 2001 |
| 1995 – 1999 | **Ernst & Young, LLP** |
| | Senior Auditor, October 1997- April 1999 |
| | Staff Auditor, October 1995-September 1997 |
| 2004 – 2007 | **University of San Francisco** |
| | Masters in Business Administration with emphasis in Finance |
| | Beta Gamma Sigma Honor Society |
| 1995 | **Georgetown University, Washington, D.C.** |
| | B.S. Accounting, Minor in Theology |

## Professional & Service Affiliations

- **Certified Public Accountant, State of California, 1998**
- **Certified Fraud Examiner**
- **Certified in Financial Forensics, 2008**
- **California Society of Certified Public Accountants**
  - State Accounting Principles and Auditing Standards Committee, Member, 2005-present
  - Co-chair San Francisco Chapter Litigation Consulting Services Committee, 2006-present
    State Steering Committee, 2007-present
  - Economic Damages Section
    Member, 2004-present
    Secretary, 2008-2009
    Vice Chair. 2010-present
  - CalCPA Leadership Institute, Spring 2006

  - Leadership Identification and Development Committee, 2007-present
- **California CPA Education Foundation**
  - Accounting & Auditing Curriculum Advisory Committee, 2007-present
- **American Institute of Certified Public Accountants**
  - CPA Ambassador, January 2006-present
  - Board of Examiners, Uniform CPA Examination Contributor
- **Association of Certified Fraud Examiners**
- **Financial Executives International (FEI)**
  - Silicon Valley Chapter
- **Georgetown University,** Alumni Admissions Committee

page 1 of 4

**San Francisco Office**
160 Spear Street
Suite 1900
San Francisco, CA 94105
Tel: 415.836.4000
Fax: 415.777.2062

**HEMMING MORSE, INC.**
CERTIFIED PUBLIC ACCOUNTANTS
LITIGATION & FORENSIC CONSULTANTS

CURRICULUM VITAE

www.hemming.com

# Greg Regan, MBA, CPA, CFF

## Professional & Service Affiliations continued

- **American Bar Association**
  – Section of Litigation
  – Section of International Law

- **Legal Aid of San Mateo County**
  – Board of Directors, Treasurer

## Publications

- *"Selecting the Right Investigative Resource"*
  (Co-author) Journal of Accountancy, December 2009

- *"Discount Rates and Lost Profits... Where's The Risk?"*
  (Co-author) CPA Expert, Summer 2009

- *"Discount Rates and Lost Profits: A Review of Case Law"*
  The Witness Chair, Winter 2009

- *"CFFs: CPAs Looking Behind Closed Doors"*
  CalCPA Magazine, September 2008

- *"Discount Rates and Lost Profits ... Where's The Risk"*
  The Witness Chair, Summer 2008

- *"Software Revenue Recognition on the Rise"*
  (Co-author) Journal of Accountancy, December 2007

- *"FAS 123R: Accounting for Stock Options, Tips for an Increasingly Complex Task"*
  CalCPA Magazine, March 2007

- *"Forensic Accounting: Is It Right For You?"*
  CalCPA.org, February 2005

- *"Talk it Over"*
  CalCPA Magazine, December 2004

## Presentations

- *"Revenue Recognition"*
  Licensing Executives Society, October 2009

- *"Accounting for Devices With Embedded Software"*
  Revenue Recognition for MedTech Companies,
  June 2009

- *"Recessionary Implications for CPAs"*
  Cal Society of CPAs, Economic Damages Section,
  May 2009

- *"Analyzing Earnings Releases"*
  San Jose Mercury News, October 2008, January 2010

- *"The Subprime Debacle & Debate About Fair Value Accounting"*
  San Francisco, Barristers Club, August 2008

- *"IPOs: Promises and Pitfalls"*
  Guest Lecturer, Golden Gate University Law School,
  March 2008, March 2009

- *"The Foreign Corrupt Practices Act: An Independent Monitor's Perspective"*
  Cal Society of CPAs, San Francisco Chapter Litigation
  Section, January 2008

- *"Options Backdating: What you need to know"*
  (Panel member) CalCPA Litigation Society,
  October 2006

- *"I've Sold Software: How and When Do I Recognize Revenue?"*
  Hemming Morse Training, November 2005

- *"Facts about Fraud"*
  Cal Society of CPAs, CPE Extravaganza,
  June 2005 and June 2006

- *"Fraud/Corporate Investigations"*
  JHI Members Conference, 2004

page 2 of 4

**San Francisco Office**
160 Spear Street
Suite 1900
San Francisco, CA 94105
Tel: 415.836.4000
Fax: 415.777.2062

HEMMING
MORSE, INC.

CERTIFIED PUBLIC ACCOUNTANTS
LITIGATION & FORENSIC CONSULTANTS

CURRICULUM VITAE

www.hemming.com

# Greg Regan, MBA, CPA, CFF

## Testimony

### Trial

- **First National v. Federal Realty Investment Trust (2008) (2009)**
  U.S. District Court, Northern District of California, San Jose Division, Case No. C-03-02013 RMW

### Deposition

- **First National v. Federal Realty Investment Trust (2008)**
  U.S. District Court, Northern District of California, San Jose Division, Case No. C-03-02013 RMW

## SEC Enforcement - Investigation Interviews

- Re: Bell MicroProducts, Inc. (March 2009)
- Re: Connectics, Inc. (August 2007)

## Selected Experience

- Directed an investigation of revenue recognition and related revenue reserves for the special committee of the board of a NASDAQ-traded pharmaceutical company pursuant to a Securities and Exchange Commission (SEC) subpoena.

- Directed an investigation of vendor allowance accounting for the Audit Committee of a publicly traded technology distributor.

- Consultant for the SEC. Assisted the accounting expert in assessing whether the financial statements of a high-technology company were prepared in accordance with Generally Accepted Accounting Principles (GAAP) and whether related audits were performed in accordance with Generally Accepted Auditing Standards (GAAS).

- Consultant for the SEC. Evaluated the consistency of the accounting principles applied by a consumer products company with GAAP and assessed the compliance of an audit in accordance GAAS.

- Lead the restatement of pre-IPO high-tech companies to establish compliance with SOP 97-2 and SAB 104.

- Assisted independent monitor in an evaluation of the compliance of a medical device company with the terms of its settlement arrangements with the U.S. Department of Justice and the SEC.

- Consultant for the SEC. Evaluated the compliance of a consumer products company with SEC regulations and addressed the response of the auditor in accordance with GAAS.

- Consultant for the SEC. Evaluated the consistency of the accounting principles of a major telecommunications company with GAAP and assessed the compliance of an audit in accordance with GAAS.

- Engaged by the Audit Committee of a Nasdaq-traded high-technology company. Investigated possible manipulation of financial statement information by accounting personnel.

page 3 of 4

**San Francisco Office**
160 Spear Street
Suite 1900
San Francisco, CA 94105
Tel: 415.836.4000
Fax: 415.777.2062

**HEMMING MORSE, INC.**
CERTIFIED PUBLIC ACCOUNTANTS
LITIGATION & FORENSIC CONSULTANTS

www.hemming.com

# Greg Regan, MBA, CPA, CFF

## Selected Experience continued

- Consultant for plaintiff, a leading developer of enterprise application software technologies and products. Assisted the damage expert in determination of damages.

- Accounting expert for the defendant. Plaintiff claimed that the defendant, a software company, improperly recognized revenue and presented misleading disclosures. Assisted the expert in the evaluation of revenue recognition and disclosure in compliance with GAAP and SEC regulations.

- Consultant for defendant, a telecommunications equipment company. Defendant claimed that plaintiff was responsible for certain lease guarantees subsequent to its divestiture from the plaintiff. Assisted the damage expert in evaluating the divestiture accounting and the plaintiff's lost profits.

page 4 of 4

**San Francisco Office**
160 Spear Street
Suite 1900
San Francisco, CA 94105
Tel: 415.836.4000
Fax: 415.777.2062

**Expert Report of Greg Regan, CPA, CFF, MBA**
**Exhibit B – Documents Considered**

Note:   For purposes of clarification, I have relied on all of the documents cited in my report, including the footnotes therein.  I have listed below these and other documents that I considered in preparing my report.

1.  Accounting Standards (GAAP).

    a.  SEC Staff Accounting Bulletin (SAB) No. 99, *Materiality*.

    b.  SAB No. 101 and 104, *Revenue Recognition*.

    c.  Statement of Financial Accounting Concepts ("SFAC") No. 2, *Qualitative Characteristics of Accounting Information*.

    d.  SFAC No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*.

    e.  Financial Accounting Standard No. 154, *Accounting Changes and Error Corrections*.

    f.  Accounting Principles Board Opinion No. 30 ("APB 30"), *Reporting the Results of Operations—Reporting the Effects of Disposal of a Segment of a Business, and Extraordinary, Unusual and Infrequently Occurring Events and Transactions*.

2.  Auditing Standards (GAAS).

    a.  AU 110, *Responsibilities and Functions of the Independent Auditor*.

    b.  AU 312, *Audit Risk and Materiality in Conducting an Audit*.

    c.  AU 326, *Audit Evidence*.

    d.  AU 334, *Related Parties*.

    e.  AU 411, *The Meaning of Present Fairly in Conformity with Generally Accepted Accounting Principles*.

3.  Pleadings.

    a.  Complaint, May 6, 2009.

    b.  Purcell Tire & Rubber Company's Answer to Plaintiffs' First, Second, Sixth and Seventh Claims for Relief and Counterclaims, June 26, 2009.

    c.  First Amended Complaint, May 4, 2010.

**Expert Report of Greg Regan, CPA, CFF, MBA**
**Exhibit B – Documents Considered**

4. Bates Stamped Documents.

   a. DJ00001-588 (see other DJ documents referenced below).

   b. PTRC0001-914.

5. Documents submitted to Grant Thornton and related responses culminating in the final determination dated February 1, 2010:

   a. Submissions and exhibits from counsel at Robison, Belaustegui, Sharp & Low dated:

      i. May 15, 2009, including the SPA, the First Amendment to the SPA, and the Earn Out Agreement,

      ii. June 2, 2009,

      iii. June 25, 2009,

      iv. July 2, 2009, including Bates DJ00589-600, and

      v. September 15, 2009, including Bates DJ00601-09.

   b. Submissions and exhibits from Manatt, Phelps & Phillips dated:

      i. October 5, 2009,

      ii. October 30, 2009, including Bates DJ00610-69,

      iii. December 11, 2009, and

      iv. January 15, 2010.

   c. Submissions and exhibits from Holland & Hart dated:

      i. June 19, 2009,

      ii. June 25, 2009,

      iii. September 8, 2009,

      iv. September 25, 2009,

      v. October 19, 2009,

      vi. December 4, 2009, and

**Expert Report of Greg Regan, CPA, CFF, MBA**
**Exhibit B – Documents Considered**

       vii.   January 8, 2010.

    d.   E-mails from Grant Thornton to the parties dated September 29, 2009 and November 8, 2009.

6. Other

    a.   File entitled Disclosure Statement – Pt. 1, which contains 132 pages of disclosures from Schedule 2.2 to 4.6.11.

    b.   File entitled Disclosure Statement – Pt. 2, which contains 127 pages of disclosures from Schedule 4.7.1 to 7.2.

    c.   "Project Drive" documents.

    d.   Litigation Services Handbook, 4th Edition, by Roman Weil et al.

    e.   Websites:

       i.   International Chamber of Commerce.

       ii.   www.fid.state.nv.us/Prime/PrimeInterestRate.pdf

**D&D**                                                                                            Exhibit 1
*Computation of Earn Out*

| Gross Profit Calculation | Calculation: | | |
|---|---|---|---|
| Grant Thornton Final Determination (2/1/10) | a | $ | 22,494,884 |
| | | | |
| **Adjustments:** | | | |
| Remove R1 ("4/30/08" Goldcorp revenue) | | | (2,816,000) |
| Remove C3 ("4/30/08" Goldcorp COGS) | | | 1,982,948 |
| Include R2 ("12/31/08" Goldcorp revenue) | | | 4,448,000 |
| Include C5 ("12/31/08" Goldcorp COGS) | | | (3,101,005) |
| Total Adjustments | b | | 513,943 |
| | | | |
| **Gross Profit as Adjusted** | c=a+b | $ | 23,008,827 |
| | | | |
| **Earn Out Computation** | | | |
| Earn-Out - 2nd Tier (i.e., part "ii") | d | | (17,360,000) |
| Gross Profit Subject to "ii" | e=d-c | | 5,648,827 |
| Earn Out Rate per "ii" per dollar | f | $ | 0.25 |
| Earn Out per "ii" | g=e*f | | 1,412,207 |
| Earn Out per "i"[1] | h | | 1,000,000 |
| **Total Earn Out due** | i=g+h | $ | 2,412,207 |
| | | | |
| | | | |
| **Prejudgment Interest Calculation** | | | |
| Beginning Date [2] | k | | 3/15/2009 |
| Award Date [4] | l | | 10/30/2010 |
| Number of days times rate equal to prime rate at | | | |
| largest bank in Nevada | m=l-k | | 594 days |
| Interest Rate [3] | n | | 9.25% |
| Interest Due | o=m*n/365 days * l | $ | 363,120 |
| | | | |
| **Total Due to D&D** | =i+o | $ | 2,775,327 |

Notes:
1 - To the extent that Gross Profit exceeded $17.36 million; the first $1 million of earn out was due from Purcell.
2 - Interest has been computed from the date payment of the earn out amount was due.
3 - Source is www.fid.state.nv.us/Prime/PrimeInterestRate.pdf
4 - This date is an estimate of the judgment date and may require updating as new information becomes available.

DD Tire

Exhibit 2

**Revenue Cut-Off for April 2008**

*Source: Purcell September 8, 2009 Submission to Grant Thornton (unshaded columns)*

|  |  | a | b | c=a-b | d=c*50% |  | e=c-d |
|---|---|---|---|---|---|---|---|
| Dated Recorded by D&D | "Corrected" Sale Date | Revenue Amount | COGS Amount | GP Amount | Grimaldi Commission | Both Dates in "Earn Out" Period [1] | EBITDA [2] |
| 3/27/2008 | 5/20/2008 | $ 192,000 | $ 135,201 | $ 56,799 | $ 28,400 |  | $ 28,400 |
| 3/27/2008 | 5/1/2008 | 192,000 | 135,201 | 56,799 | 28,400 |  | 28,400 |
| 3/27/2008 | 6/1/2008 | 128,000 | 90,134 | 37,866 | 18,933 |  | 18,933 |
| 4/9/2008 | 5/20/2008 | 192,000 | 135,201 | 56,799 | 28,400 | Yes |  |
| 4/9/2008 | 5/16/2008 | 192,000 | 135,201 | 56,799 | 28,400 | Yes |  |
| 4/15/2008 | 6/1/2008 | 192,000 | 135,201 | 56,799 | 28,400 | Yes |  |
| 4/15/2008 | 6/1/2008 | 192,000 | 135,201 | 56,799 | 28,400 | Yes |  |
| 4/15/2008 | 6/2/2008 | 192,000 | 135,201 | 56,799 | 28,400 | Yes |  |
| 4/15/2008 | 5/20/2008 | 192,000 | 135,201 | 56,799 | 28,400 | Yes |  |
| 4/30/2008 | 5/23/2008 | 192,000 | 135,201 | 56,799 | 28,400 | Yes |  |
| 4/30/2008 | 6/??/08 | 192,000 | 135,201 | 56,799 | 28,400 | Yes |  |
| 4/30/2008 | 5/23/2008 | 192,000 | 135,201 | 56,799 | 28,400 | Yes |  |
| 4/30/2008 | 7/9/2008 | 192,000 | 135,201 | 56,799 | 28,400 | Yes |  |
| 4/30/2008 | 5/20/2008 | 192,000 | 135,201 | 56,799 | 28,400 | Yes |  |
| 4/30/2008 | 6/25/2008 | 192,000 | 135,201 | 56,799 | 28,400 | Yes |  |
|  |  | $ 2,816,000 | $ 1,982,948 | $ 833,052 | $ 416,526 |  | $ 75,732 |
| Totals for D&D Mar-08 Sales: |  | $ 512,000 | $ 360,536 | $ 151,464 | $ 75,732 |  | $ 75,732 |
| Totals for D&D Apr-08 Sales: |  | $ 2,304,000 | $ 1,622,412 | $ 681,588 | $ 340,794 |  |  |
|  |  |  |  | 82% |  |  |  |

Notes

1 - The Earn Out Period was from April 1, 2008 through December 31, 2008.
2 - If, instead, Purcell's interpretation of title transfer is correct - the amount by which EBITDA for the trailing twelve months ended March 31, 2008 is impacted.

Expert Report of Greg Regan dated June 3, 2010

Confidential - Prepared in Connection with Litigation

**D&D**                                                        **Exhibit 3**
**Estimated Annual Revenue**

|  | Sales | Gross Profit | Source |
|---|---|---|---|
| ~ 2003 | 22,855,920 | 6,385,001 | [a] |
| ~ 2004 | 28,429,385 | 8,467,251 | [a] |
| ~ 2005 | 36,938,108 | 12,396,008 | [b] |
| 2006 | 48,914,653 | 18,850,776 | [c] |
| 2007 | 59,041,293 | 19,450,364 | [d] |
| 2008 | 91,591,259 | 28,841,361 | [e] |



**Source:**
[a]  Reviewed financial statements for the year ended January 31, 2004 and 2005.  These financial statements reflect 11 months of calendar 2003 and 2004, respectively.

[b] Reviewed financial statements for the year ended January 31, 2006.

[c] Reviewed financial statements for the 11 month period ended December 31, 2006 plus the unadjusted monthly  results for January 2006 (see file entitled "Jan06" within the folder "project drive - BKD\Item Ii - P&L and Balance Sheets for 3 years\2005."

[d] Reviewed financial statements for the 12 month period ended December 31, 2007.

[e] Assumes the correctness of the Grant Thornton February 1, 2010 final determination for 2008 plus the revenue and gross profits achieved by D&D for the three months ended March 31, 2008 as per the related financial packages (see DJ00067-68, DJ00110-11, and DJ00155-56).

**D&D**                                                                        Exhibit 4
**Actual Monthly Revenue**

|           | 2007 |      |   | 2008 |      |
|-----------|-----------:|----|---|-----------:|----|
| January   | $ 3,259,490 | [a] | $ | 5,304,565 | [b] |
| February  | 4,914,700 | [a] |   | 5,615,841 | [c] |
| March     | 5,755,933 | [a] |   | 8,239,256 | [d] |
| April     | 4,290,791 | [a] |   | 9,603,689 | [e] |
| May       | 4,359,541 | [a] |   | 6,835,763 | [f] |
| June      | 4,906,204 | [a] |   | 8,179,587 | [g] |
| July      | 4,975,281 | [a] |   | 6,993,445 | [h] |
| August    | 5,215,163 | [a] |   | 6,157,530 | [i] |
| September | 4,050,423 | [a] |   | 10,484,595 | [j] |
| October   | 4,351,337 | [a] |   | 8,014,999 | [j] |
| November  | 6,797,659 | [a] |   | 7,548,118 | [j] |
| December  | 5,797,727 | [a] |   | 8,617,524 | [j] |
| Total     | $ 58,674,249 |  | $ | 91,594,912 |  |



Source:
[a]File entitled "2008 ALL Budget" from Project Drive request Item Iaaa.  The 2007 sales are actual and total  $58.7 million.  The reviewed 2007 financial statements reflect total revenue of $59.2 million (< 1% difference).
[b] January 2008 financial package at DJ00067-68.
[c] February 2008 financial package at DJ00110-11.
[d] March 2008 financial package at DJ00155-56.
[e] April 2008 financial package at DJ00197-98.
[f] May 2008 financial package at DJ00240-41.
[g] June 2008 financial package at DJ00283-84.
[h] July 2008 financial package at DJ00326-27.
[i] August 2008 financial package at DJ00368-69.
[j] Grant Thornton final determination.